UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

FILED

2024 NOV 25 PM 1:00

US DISTRICT COURT
EASTERN DIST. TENN.

STUART N. BROTMAN

1922 Lyons Bend Road

Knoxville, TN 37919

Plaintiff,

Case No: 3:24cv 472

Judge Crytzer / Poplin

v.      COMPLAINT WITH JURY DEMAND ENDORSED HEREON

THE UNIVERSITY OF TENNESSEE

813 Andy Holt Tower

Knoxville, TN 37996


THE UNIVERSITY OF TENNESSEE FOUNDATION, INC.

1525 University Avenue

Knoxville, TN 37921


JOSEPH MAZER

1331 Circle Park Drive

Knoxville, TN 37996


COURTNEY CHILDERS

1331 Circle Park Drive

Knoxville, TN 45220

Now comes Plaintiff, Stuart N. Brotman, by and through counsel, and for his Complaint against Defendants, The University of Tennessee; The University of Tennessee Foundation, Inc.; Joseph Mazer; and Courtney Childers, states as follows:

## PARTIES AND CLAIMS

1. Stuart N. Brotman ("Brotman") is a tenured full professor in the College of Communication and Information ("CCI") at The University of Tennessee, Knoxville ("UTK").

2. The University of Tennessee ("University") is a State institution of higher education.

3. The University of Tennessee Foundation, Inc. ("Foundation") is a non-profit corporation that supports The University of Tennessee's educational, research, and public activities by seeking, receiving, and administering private funds to support programs beyond the scope of the University's general budget.

4. Joseph Mazer ("Mazer") is Dean of CCI at UTK. He is sued in his individual and official capacities.

5. Courtney Childers ("Childers") is CCI Associate Dean for Academic Affairs and Student Success, having assumed this role on July 1, 2024 under appointment by Mazer, directly reporting to him. She formerly was appointed by Mazer to serve as the Interim Director of CCI's School of Journalism and Media ("JMED"), previously named the School of Journalism and Electronic Media ("JEM"), and reported directly to him. Her actions in this case are based on that former role, not her current one. She is sued in her individual and official capacities.

6. The University, Foundation, Mazer, and Childers are Defendants in this case.

7. Upon information and belief, the University had input, responsibility, and culpability for allegations contained in, and incorporated by reference, in this Complaint.

8. Upon information and belief, the Foundation had input, responsibility, and culpability for allegations contained in, and incorporated by reference, in this Complaint.

9. Upon information and belief, Mazer had input, responsibility, and culpability for allegations contained in, and incorporated by reference, in this Complaint.

10. Upon information and belief, Childers had input, responsibility, and culpability for allegations contained in, and incorporated by reference, in this Complaint.

11. Defendants knowingly and unlawfully implemented an unprecedented and ongoing campaign of harassment, intimidation, and coercion to secure Brotman's involuntary resignation and retirement from the University after he reached the age of 69 years old.

1

12. Their actions intentionally have interfered with, and breached, Brotman's employment agreement with the University; knowingly violated the Older Workers Benefit Protection Act and the Age Discrimination Act; and denied Brotman's Due Process Rights as a tenured full professor.

13. Brotman seeks money damages against the University for breach of contract and violating the Older Workers Benefit Protection Act and Age Discrimination Employment Act; money damages against the Foundation for its tortious interference with Brotman's employment agreement with the University; and money damages against Mazer and Childers for violation of his Fourteenth Amendment rights.

14. Brotman filed a timely complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").

15. Subsequently, the EEOC issued Brotman a Right to Sue notice, a copy of which is attached herein as "Exhibit A."

16. All preconditions for filing this lawsuit have been performed or have occurred.

## JURISDICTION

17. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331. Jurisdiction is appropriate because Brotman seeks to redress deprivations of rights conferred by the Fourteenth Amendment to the Constitution of the United States, and under the Older Workers Benefit Protection Act and Age Discrimination Employment Act.

## VENUE

18. Venue in this Court is proper because the actions out of which these claims arose occurred within the venue of the U.S. District Court for the Eastern District of Tennessee.

## BACKGROUND

19. This Complaint is based upon the facts set forth below. They detail a multi-party effort to achieve Brotman's involuntary resignation and retirement as a tenured full professor at the University, including once he reached the age of 70.
20. Brotman currently is the oldest tenured full professor in CCI's JMED—71 years, 11 months old. An unprecedented pressure campaign against him--including harassment, intimidation, and coercion--began at the age of 69 years, 6 months in June 2022. It increased since Brotman turned 70 in December 2022 and is continuing.
21. Mazer, Childers, and those at the University who have participated in this pressure campaign have at all times had actual knowledge of Brotman's age through University personnel records, as well as actual knowledge of University Board of Trustees policies and the University of Tennessee, Knoxville Faculty Handbook.
22. This pressure campaign has entailed coordination at various levels of the University and Foundation, all involving Mazer, who has demonstrated an unwavering focus on securing Brotman's involuntary resignation and retirement from the University. He has demonstrated a

2

knowing willingness to disregard the law. He has been assisted and supported in these efforts by Childers.

23. To understand the full extent of the actions at issue here, a detailed chronological timeline is presented herein.

**How the University Recruited Brotman to Join the UTK Faculty as a Tenured Distinguished Endowed Full Professor**

24. The recruitment for Brotman's tenured full professorship at the University was undertaken in 2015, following the public announcement in November 2013 that "University of Tennessee alumnus Larry Patrick has given $1 million to the College of Communication and Information, **the largest single cash gift** in the college's history, to establish a distinguished professorship to honor a longtime professor and administrator [Herb Howard]." (emphasis added).

25. According to a November 1, 2013 University public announcement, Larry Patrick indicated that he was "honored to be recognized for my efforts to create a **legacy gift** to the university. My desire to honor Herb Howard reflects his lifetime of service to the university and serves as a thanks from one of many students who benefited by having Dr. Howard as a teacher. UT is a very special place to me and I am fortunate to repay all that UT did for me with this gift." (emphasis added).

26. This cash gift was consistent with the Foundation requirement that a named Distinguished Professorship be funded at a $1 million minimum gift level.

27. It also reflected compliance with University Policy F10315, which characterizes gifts as "**monies or property voluntarily given to the University or to the Foundation for the benefit of the University, without expectation of return or compensation on behalf of the donor. Gifts to the University are unconditional transfers**, a requirement for being classifieds as a charitable deduction. Refunds will only be made in the event of a mistake or an extreme circumstance if determined by the Foundation." (emphasis added).

28. Further, the University announced publicly that "Patrick also increased his estate gift to the college to $5 million. The initial $1 million will establish the Herb Howard Distinguished Professorship in Media Management and Law, named for Journalism and Electronic Media Professor Emeritus Herb Howard. At some point in the future, this gift will be combined with Patrick's $5 million estate gift to replace the distinguished professorship with an endowed chair, also honoring Howard."

29. The CCI dean then, Mike Wirth, also noted in the public announcement, "We are very grateful to Larry Patrick for making this remarkable gift. His decision to establish this distinguished professorship will have a transformational impact on the college as we build on the legacy of excellence established by Dr. Howard on our journey to the Top 25."

30. After an extensive national search and subsequent University recruitment process was undertaken, Brotman was selected in 2015 for appointment to the Howard Distinguished Endowed Professorship. This position was distinctive among all universities in the United States, making it particularly attractive to Brotman as he considered the opportunity.

3

31. Both Larry Patrick and Mike Wirth played active roles in inducing Brotman to move from the Boston, Massachusetts area, where he was serving as a faculty member at Harvard Law School, to accept the University's offer.
32. Larry Patrick also informed Brotman, in a May 4, 2015 email, that then-Chancellor Jimmy Cheek conveyed in a conversation with him "that you were exactly the type of scholar that Tennessee needs to help in its drive to the Top 25."
33. The result of this aggressive recruitment process was an offer letter, agreed to through signature by then-Provost Susan Martin, acting on behalf of the University, and accepted by Brotman through his countersignature. This is attached herein as "Exhibit B".
34. The letter, dated July 13, 2015, appointed Brotman as "the Howard Distinguished Endowed Professor in Media Management and Law in the School of Journalism and Electronic Media, College of Communication and Information at the University of Tennessee. This position is to begin January 1, 2016 at a salary of one hundred eighty thousand dollars ($180,000) per academic year (two semesters)."
35. Since Brotman joined UTK on January 1, 2016, Brotman's salary for this position has been increased several times based on university-wide merit salary increases that are governed by Section 3.8.1.1 of the UTK Faculty Handbook; corresponding benefits also are reflected in any salary increases made after that date.
36. Brotman's faculty tenure was granted by the The University of Tennessee Board of Trustees, effective February 23, 2016, with the confirmation letter attached herein as "Exhibit C."

**Subsequent Heralding of, and Additional Fundraising Related to, Brotman's University Hiring**

37. After Brotman's move to Knoxville to become the Howard Distinguished Endowed Professor, the Foundation and the University heralded his appointment publicly multiple times. For example, the Foundation itself issued a public release headlined "Larry Patrick ('73) Wanted to Honor His Favorite Professor, Herb Howard." That release indicated this "Endowed Professorship Puts UT on the Cutting Edge of Telecommunications."
38. Mike Wirth characterized Brotman there as "a major player. **He dramatically elevates our national and international impact and visibility in the telecom and new media areas. He's a Renaissance guy.** He votes on the Emmys. He knows everybody. Everybody knows him. **He can bring people to campus who would never come otherwise.**" (emphasis added).
39. The Foundation closed this release with a direct financial solicitation based on the success of recruiting Brotman to UTK, based on Larry Patrick's widely publicized cash gift. "Want to make a difference at UT with gifts like the one Larry Patrick made? Contact the Office of Gift Planning…to get started."
40. In this and other promotional material, the Foundation sought to capitalize on Brotman's hiring by using it as an example to solicit other gifts to the University. Brotman's hiring thus created a value to the Foundation and the University that was beyond the financial terms of Brotman's employment agreement.

## Years Later, Brotman Was Presented with a Surprising Ultimatum Regarding His University Position

41. On May 19, 2022, in a surprising Zoom conference call initiated by Mazer, with Brotman's then-immediate direct supervisor, CCI's School of Journalism and Electronic Media Director Catherine Luther ("Luther") participating, Mazer conveyed "the unfortunate news" that Brotman no longer would be serving as the Herb Howard Distinguished Endowed Professor of Media Management and Law.
42. Mazer indicated on this call that this new "reality" resulted from a revised gift agreement between the donor of the Howard Distinguished Endowed Professorship and The University of Tennessee Foundation, which administers donations to The University of Tennessee, Knoxville.
43. Neither the original gift agreement nor its purported revision have been provided to Brotman, either during his extended recruitment to the University--when he relied on the University's representations that the support for his appointment was the legacy cash gift from Larry Patrick--or at any time subsequently.
44. Additionally, neither the Foundation nor the University informed Brotman that any stipulations in the gift agreement might affect the title, salary, and benefits in the July 13, 2015 appointment letter that Brotman accepted. Had there been any of these caveats, Brotman would have declined the offer and not moved to Knoxville.
45. Additionally, Mazer and Luther did not at any time provide to Brotman further details about either the Larry Patrick gift agreement or its purported revision.
46. Mazer further suggested that the withdrawal of cash gifts by donors such as in this instance was not uncommon. He expressed a surprising lack of knowledge, given his role as dean, regarding the circumstances that led to the cancellation of Brotman's unconditional appointment as the Howard Distinguished Professor of Media Management and Law.
47. As the recipient of this gift, the Foundation had the authority to revise the gift agreement with Larry Patrick. If such a revision occurred, it knowingly and directly interfered with the University's ability to satisfy the terms of its employment agreement with Brotman, with consequential and detrimental financial and reputational impact for him.
48. During this Zoom call, Mazer also indicated he was "studying the mechanics" of the salary reduction he would be imposing on Brotman as a result, and indicated he would follow up with information about it.
49. The next day--May 20, 2022--in an email sent to Brotman and Luther, he attached a signed letter indicating that Brotman's then-current salary as the Howard Distinguished Endowed Professor would be reduced by $35,400 annually, along with Brotman losing the invaluable specified title of Distinguished Professor. This would result in a new salary of $151,669, which also would mean a reduction of any University benefits that are tied to salary (e.g., retirement benefits).
50. Mazer and Luther subsequently met Brotman in person on June 30, 2022. Brotman then was informed the salary reduction and the loss of his Distinguished Professor title would take effect on August 1, 2022. Brotman then would be 69 years, 8 months old.
51. These financial and reputational losses to Brotman have continued in effect ever since then.
52. Simultaneously, and of great importance, Mazer discussed the possibility of Brotman requesting, in the alternative, a permanent separation from the University under its Voluntary Retirement

5

Program (VRP). That program was specifically restricted to senior faculty members who were at least 60 years old.

53. No other University tenured full professor has had the possibility of resigning under the VRP raised by a dean in conjunction with a substantial reduction of salary, benefits, and academic title—which would take effect if a VRP resignation and retirement by Brotman did not take place.
54. Mazer's message to Brotman was particular and clear—either accept a "voluntary" retirement package or be subject to detrimental financial and reputational terms that, on their face, represented a breach of Brotman's employment agreement with the University.
55. Mazer indicated that this VRP option only would be pursued at Brotman's request. Mazer indicated that he would be willing to follow up on this matter with the Chancellor and Provost.
56. Mazer expressed optimism that his request for Brotman's resignation and retirement would be granted, thus enabling Brotman to participate in the VRP. It is possible, if not likely, that this optimism was based on prior discussions within the University prior to this offer being extended by Mazer.
57. Mazer followed up after the June 30, 2022 meeting with an email that included a link to the VRP for Brotman to review.
58. Brotman made no commitments during the meeting regarding either the salary, benefits, and academic title reduction, or in his interest in making a request that Mazer initiate an inquiry regarding the potential of Brotman's participation in the VRP.
59. On July 19, 2022, Brotman sent an email to Mazer and Luther indicating that he would not be pursuing Mazer's offer to be included as a participant in the VRP before the diminution of his salary, benefits, and academic title took place.
60. At that point, Brotman believed the discussion about his resignation and retirement had ended. Clearly, however, it was only the beginning of longer-term strategy, which accelerated after Brotman turned 70 years old in December 2022.

**Accelerating the Pressure Campaign to Secure Brotman's Involuntary Resignation and Retirement**

61. Brotman's age--along with the University being informed about a subsequent serious medical diagnosis, which led to a request that the University grant a reasonable accommodation under the Americans with Disabilities Act (i.e., teaching remotely rather than in-person for the fall 2023 semester), were driving forces in this unprecedented multi-year pressure campaign to achieve Brotman's involuntary resignation and retirement.
62. Mazer employed as a cudgel, at the outset, the mandated faculty salary and rank reduction discussed above. In total, he made four separate attempts in two years to have Brotman resign and retire from his tenured full professorship, either under the University's Voluntary Retirement Program or through a customized Agreement and Release formulated by the University that was not offered to any other University faculty member.
63. In early 2023, as noted, Brotman was diagnosed with a serious medical condition. He notified the University's Office of Equity and Diversity (OED) via email on March 16, 2023, in accordance with OED's reporting protocol under the Americans with Disabilities Act (ADA). The OED has the sole University responsibility to make an ADA reasonable accommodation determination.

6

64. Brotman will make available relevant medical records to the Court if all parties to this matter agree to a Court order enabling such a submission under seal.
65. On March 20, 2023, Brotman's new immediate direct supervisor, Childers, who reported directly to Mazer as Interim Director of JEM, met with Lisa Keathly("Keathly"), OED's Coordinator of Equal Access and Opportunity, to discuss the information Brotman provided to OED.
66. Childers then emailed Brotman on March 22, 2023 "regarding your accommodation for flexibility through fall 2023." Further, she wrote, "What can I do to support you here?"
67. During a March 29, 2023 Zoom call with Childers, Brotman explained that although he did not expect to require an ADA reasonable accommodation for the balance of the spring 2023 semester then in progress, he anticipated that some ADA reasonable accommodation might be needed for the upcoming fall 2023 semester.
68. This possibility also is reflected in a March 20, 2023 email to Keathly, where Brotman wrote that "as my doctor's notes indicated, treatment is expected to continue at least [until] December 2023."
69. On August 14, 2023, OED requested that Brotman provide updated information regarding his medical situation and need for a fall 2023 reasonable accommodation under the ADA.
70. On August 17, 2023, Childers informed Brotman in a Zoom call that pending this updated information, and contrary to her prior understanding of the full timeframe at issue, she would not permit Brotman to teach two courses remotely in the fall semester 2023.
71. Childers indicated that she had no discretion since the matter was within the OED. She said that the OED exclusively could decide for the University any ADA reasonable accommodation request, based on Brotman's updated medical documentation; neither Childers nor Mazer would be making this decision.
72. Brotman then initiated a request with his medical provider for this updated documentation and notified the OED that he expected to provide it in September 2023.
73. This documentation was emailed to the OED on September 28, 2023.

**Additional Pressure is Applied for Brotman to Involuntarily Resign and Retire from the University**

74. On August 23, 2023, Brotman received an email from Mazer requesting an urgent meeting that day "to talk through your options for the semester."
75. A Zoom call then took place that afternoon, with Mazer, Childers, and Brotman participating.
76. But the purported agenda for the meeting differed markedly from what took place. Mazer's unrelenting effort to extract Brotman's resignation and retirement from the University, now joined and supported by Childers, starkly re-emerged there.
77. Mazer presented for the first time a detailed "voluntary" retirement package for time-sensitive execution by Brotman.
78. Surprising to Brotman during this Zoom call, this was the sole matter that was discussed. No other "options for the semester" were mentioned at all.
79. Immediately following that call, Mazer followed up with Brotman via email with several documents regarding this proposed retirement package for Brotman's review. Mazer indicated this

7

package already was approved by the University. At that point, Brotman was 70 years, 8 months old.
80. Separately in that email, Mazer included his own cover memorandum that specified a September 30, 2023 effective resignation date. He indicated ominously that acceptance of the package would "eliminate the likelihood of termination based on negative feedback regarding teaching."
81. Mazer's powerful threat was clear--resign and retire under the threat of outright termination of Brotman's tenured full professorship, which clearly violated Brotman's Constitutional rights under the Fourteenth Amendment.
82. This threat also violated University due process rights as a tenured full professor accorded to Brotman in the July 13, 2015 University appointment letter. That letter specifies: "The policies of the University of Tennessee with regard to tenure are governed by the Faculty Handbook and relevant portions of the University of Tennessee Board of Trustees Policy."
83. Such a threat of dire consequences for Brotman is outside of the scope of Mazer's official University authority. He bears personal liability for his actions.
84. Childers was aware of this threat and did not object to it in any way. She also was operating outside the scope of her official University authority and bears personal liability for her actions.
85. On August 25, 2023, after an initial review of the emailed documents from Mazer, Brotman informed Mazer that the acceptance deadline imposed by him would not enable Brotman to receive the 21-day review period specified in them, which is mandated by the Older Workers Benefit Protection Act (OWPBA) that covers Brotman, given his age.
86. Accordingly, Brotman notified Mazer via email then that he would "need to have this 21-day review period] timeframe honored..." Brotman also indicated that considering this, "I intend to commence teaching next week, with the understanding that the OED process will continue to move ahead, as well."
87. In an email response that same day, Mazer wrote, "I have checked with the General Counsel's office. They didn't realize when they drafted the agreement that, from an academic operations perspective, we do not have the flexibility to wait 21 days. **They have revised the agreement, which is attached, to remove the entire section related to the Older Workers Benefit Protection Act. So the provisions you mentioned are no longer in the agreement.**" *(emphasis added)*.
88. The University Office of General Counsel is comprised of various attorneys who are responsible for the legal affairs of UTK. They include C. Ryan Stinnett, Rachel Powell, Katie Lane, Lela Young, Frank Lancaster, Mike Fitzgerald, Harold Pinkley, Walt Schuler, and Caitlyn Elam.
89. The University Office of General Counsel had actual knowledge of the OWPBA and its mandatory review provisions. It willingly participated in satisfying Mazer's request to have University legal counsel delete these provisions entirely in a revised agreement.
90. In doing so, in addition to raising ethical issues under the jurisdiction of the Board of Professional Responsibility of the Supreme Court of Tennessee, the relevant Office of General Counsel attorneys who participated in this matter clearly understood that they were acting to contravene the OWPBA.

8

91. Mazer's request to create an exception to the OWBPA, whether for his own personal convenience or reflecting his understanding of his official University duties, clearly violated the law.
92. The role of the Office of General Counsel is satisfying this request by eliminating the required OWBPA provisions in a revised agreement also violated the law. It compromised the legal integrity of its attorneys, as well.
93. Mazer and the University singularly were focused on implementing a conclusive agreement for Brotman's speedy resignation and retirement, regardless of the OWBPA. They knowingly violated the specific review requirements of the OWBPA to hastily obtain Brotman's execution of the revised agreement for their own purposes and on their own schedules.
94. They ignored affording Brotman the legal protection that the OWBPA requires.
95. Mazer and the University's illegal rush to secure Brotman's involuntary resignation and retirement is underscored further in Mazer's August 25, 2023 email, when he imposed a new review and response deadline, with the concurrence and active involvement of the University Office of General Counsel.
96. This deadline for Brotman, after the OWBPA protections knowingly had been removed from the revised agreement, was less than 24 hours later, until noon on August 26, 2023. Clearly, this exceedingly tight timeframe was intended to apply even more pressure for Brotman to agree with its terms.
97. Brotman responded on August 26, 2023 to Mazer in an email by that new deadline. Brotman wrote that he would not "waive any of the rights accorded me under the Older Workers Benefit Protection Act. Consequently, I am not able to participate in the revised agreement."
98. Brotman also indicated that "[i]f consideration of a suitable arrangement for my January 1, 2024 retirement remains an option, please let me know."
99. Mazer did not respond to this comment regarding the possibility of negotiating a voluntary resignation and retirement agreement. At that point, as before, Brotman thought the issue of his involuntary resignation and retirement was put to rest. Subsequent developments proved him wrong. Mazer's unwavering persistence, now fully supported by Childers, would re-emerge soon.

**Increasing the Pressure on Brotman Yet Again to Involuntarily Resign and Retire from the University**

100. Mazer waited two weeks until September 22, 2023 and then began his age-related pressure campaign once again, seeking Brotman to accept another "voluntary" retirement package that was conditioned on Brotman's resignation and retirement from his tenured full professorship. At that point, Brotman was 70 years, 9 months old.
101. A new memorandum by Mazer, accompanied by a package of documents apparently approved by the University, was emailed to Brotman then. There, Mazer repeated the threatening assertion that if Brotman accepted this package, it would "eliminate the likelihood of termination based on negative feedback regarding teaching."
102. This new memorandum also repeated another initial retirement and resignation offer of August 23, 2023, which was directly tied to the still-pending OED approval process for Brotman's requested ADA accommodation: "It further eliminates the need for medical documentation through the [OED] accommodation process."

9

103. There is no apparent reason for connecting an ADA reasonable accommodation request here, other than for Mazer to present it as another reason why Brotman should agree to a speedy "voluntary" resignation and retirement.

104. Unlike the earlier revised agreement, Mazer specified a review period that respected the OWPBA's 21-day review timeframe, so that a response would be due "on or around October 4, 2023." It did not fully comply with other OWPBA requirements, however.

105. On October 4, 2023, the OED finally approved Brotman's fall 2023 semester request for remote teaching as an ADA reasonable accommodation, based on the updated medical documentation that Brotman provided to OED.

106. In the interim between September 22, 2023 and Mazer's "on or around October 4, 2023" review deadline, Brotman contracted COVID-19 and provided Childers with medical documentation confirming this on September 23, 2023.

107. Childers was aware of Mazer's "on or around October 4, 2023" review deadline. This illness clearly required that the review period be extended by a few days, although still within a review period that had been characterized by Mazer as "at least 21 days." Mazer contends that he was unaware of Brotman contracting COVID-19, although Childers--Brotman's immediate supervisor, who reported directly to Mazer--was fully briefed by Brotman about it and apparently did not inform him.

108. On October 5, 2023, as Brotman recovered from COVID-19, he advised both Childers and the OED via email that he would be hospitalized for his (unrelated) serious medical situation on October 6, 2023, following his in-person classroom teaching on October 5, 2023. According to Mazer, Childers also failed to notify him of this additional exigent circumstance.

109. Nevertheless, Brotman emailed Mazer on October 6, 2023 advising of his imminent hospitalization. He informed Mazer that he would not be signing the new revised resignation and release agreement "because it would not be prudent to consider executing, as part of it, a broad waiver of all my federal and state legal rights (e.g., those provided in statutes, regulations, other administrative guidance, and common law doctrines)—including but not limited to, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, and any Claims under any tort or contract theory."

110. Brotman's age, and his request for a reasonable accommodation under the ADA, unmistakably have been at the core of the concerted efforts by the University, Mazer, and Childers to achieve Brotman's involuntary resignation and retirement under their determined schedule—initially, as Brotman was about to turn 70 years old, and then repeatedly and more aggressively after he reached the age of 70 in December 2022 and developed a serious illness.

111. This orchestrated pressure campaign to force Brotman to accept a "voluntary" resignation and retirement package continued in full force, with his knowledge that such an acceptance would eliminate the granting of Brotman's requested ADA reasonable accommodation, as well.

112. Moreover, when such an accommodation was granted by OED, Mazer emphasized that it was himself, rather than the OED, that controlled the ADA approval process. He noted in an October 11, 2023 email to Brotman that "I have approved the OED-recommended accommodation, allowing you to teach remotely for the remainder of the semester."

113. This assertion is not consistent with University policy, which provides that the OED, rather than a dean, has the exclusive authority to approve an ADA reasonable accommodation. Mazer again clearly was acting outside the official duties of his University appointment.
114. After these events, Childers submitted in October 2023 an Annual Performance and Planning Review of Brotman to Mazer that contained explicit remarks related to Brotman's age. Brotman objected to comments that were included there as a basis for evaluation. He noted, **"These statements, if endorsed by JEM and/or CCI, likely are actionable undthe federal Age Discrimination in Employment Act and the Tennessee law of defamation."** (emphasis added).
115. Mazer endorsed the Childers Annual Performance and Planning Review by accepting these comments without reservation and ignoring Brotman's concern about them. He then sent his own submission, including the comments, to Diane Kelly, then the UTK Vice Provost for Faculty Affairs, who in turn supported Mazer's findings, as well.
116. As contained in all three review reports, one notable comment was stark, and clearly age-related: **"For the love of god find someone else to teach this class because this old fuck is not able to function as a competent professor any more."**
117. Mazer's finding, with Childers's concurrence, was made and repeated as the pressure campaign continued for Brotman to involuntarily resign and retire from the University. If Brotman did not do so, as Mazer noted more than once, he would face "the likelihood of termination based on negative feedback regarding teaching."
118. The University and Mazer continue in the 2024-25 academic year on their march to secure Brotman's involuntary resignation and retirement.
119. For example, upon Mazer's recommendation, the University now is undergoing a Periodic Post-Tenure Performance Review (PTPR) for Brotman during the 2024-25 academic year.
120. A key indicator of its lack of required objectivity is that Brotman's PTPR will not include all the due process protections embodied in the UTK Faculty Handbook. The PTPR Committee that is tasked with evaluating Brotman includes a faculty member nominated by Mazer. As CCI dean, Mazer also makes recommendations about this faculty member's annual performance review and potential salary and benefit increases that may result.
121. Mazer himself, in his role as CCI dean, also will play a central role in Brotman's PTPR, providing a mandatory recommendation and supporting reasons for his determination to UTK's Chief Academic Officer.
122. Yet to date, and contrary to the UTK Faculty Handbook, no one at the University has raised any need for recusals due to any inherent conflict of interest, based on Mazer's pre-determined finding that Brotman's termination as a tenured full professor was likely.
123. Mazer will continue to move ahead to secure Brotman's involuntary resignation and retirement.
124. As detailed above, the actions of Defendants have resulted in a continuous pressure campaign to secure Brotman's involuntary resignation and retirement from the University. They reflect harassment, intimidation, and coercion that violates the Age Discrimination Act.
125. The findings at a jury trial will represent the best remedy for ending the brazen actions of the Defendants to sever Brotman's University ties with unjust and ruthless efficiency.

11

## COUNT I--Breach of Contract

126. The University failed to perform its financial obligations under its employment agreement with Brotman, and ultimately breached them entirely by withdrawing Brotman's endowed distinguished professorship and reducing his salary and University benefits permanently.
127. Brotman has suffered money and reputational damages because of such breach.

## COUNT II—Tortious Interference with Contract

128. The Foundation renegotiated its otherwise irrevocable cash gift agreement with donor Larry Patrick. This action intentionally interfered with the employment agreement between the University and Brotman.
129. Brotman has suffered money and reputational damages as a result.

## COUNT III—Violation of the OWBPA

130. The University knowingly denied Brotman's mandatory rights accorded by the OWBPA.
131. This denial prevented Brotman from reaching an agreement under the OWPBA.
132. Brotman has suffered money damages as a result.

## COUNT III-- Denial of Due Process

133. Brotman possesses a Fourteenth Amendment property interest in his position as a tenured distinguished full professor, and in the employment and reputational interests that are integral components of these positions. As such, this interest may not be impaired without Due Process of Law.
134. Mazer's explicit finding that Brotman's ongoing tenure and University employment created "the likelihood of termination based on negative feedback regarding teaching" without notice or an opportunity to be heard. It significantly impaired this property interest and violated Brotman's right to Due Process of Law under the Fourteenth Amendment.
135. Childers supported this finding as Brotman's immediate direct supervisor, and bears personal liability, as well.
136. The impairment of these rights is ongoing, and Brotman's damages will continue to multiply.

## COUNT IV --Denial of Due Process

137. Brotman possesses a Fourteenth Amendment liberty interest in his position as a tenured distinguished full professor, and in the employment and reputational interests that are integral components of these positions. As such, this interest may not be impaired by Defendants without Due Process of Law.
138. Mazer's explicit finding, supported by Childers, that Brotman's ongoing tenure and University employment created "the likelihood of termination based on negative feedback regarding teaching" without notice or an opportunity to be heard. It significantly impaired this liberty interest and violated Brotman's right to Due Process of Law under the Fourteenth Amendment.

139. Childers supported this finding as Brotman's immediate direct supervisor, and bears personal liability, as well.
140. The impairment of these rights is ongoing, and his damages will continue to multiply.

### COUNT V—Violation of the ADEA

141. The University, Mazer, and Childers treated Brotman differently from other tenured professors because of his age.
142. This treatment constituted harassment under the ADEA.
143. Damages have resulted for Brotman and will continue to multiply.

WHEREFORE, Stuart N. Brotman demands the following relief:

1. Money damages against the University for breach of contract.
2. Money damages against the Foundation for tortious interference with Brotman's employment agreement with the University.
3. Money damages against the University for violating the OWBPA.
4. Money damages against the University, Mazer, and Childers for violating the ADEA.
5. Money damages against Mazer for violating the OWBPA.
6. Money damages against Mazer for violation of his Fourteenth Amendment rights.
7. Money damages against Childers for violation of his Fourteenth Amendment rights.
8. Attorney's fees.
9. All costs, disbursements, fees, and interest as authorized by applicable law.
10. Trial by Jury.
11. All other relief that the Court deems appropriate and proper.

Respectfully submitted,

/s/ Stuart N. Brotman

Stuart N. Brotman

*Pro Hac Vice* Admission Pending

1922 Lyons Bend Road
Knoxville, TN 37919
865-282-2136

**Attorney for Plaintiff**

## JURY DEMAND

Plaintiff demands a trial by jury on all Issues contained herein.

/s/ Stuart N. Brotman

Stuart N. Brotman

*Pro Hac Vice* Admission Pending

**Attorney for Plaintiff**

14